Filed 1/18/24  P. v. Flores CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HECTOR FLORES II,<br><br>    Defendant and Appellant. | D079705<br><br><br>(Super. Ct. No. SCE385427) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert Amador, Judge.  Affirmed in part and reversed in part.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

Hector Flores II appeals from the final judgment entered after a jury found him guilty of second-degree murder with true findings on firearm and gang enhancement allegations.  Flores contends that reversal of his murder

conviction is warranted because (1) the trial court prejudicially erred by allowing expert opinion testimony regarding Flores's guilt and intent, and (2) recently enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) applies retroactively to his conviction and requires a bifurcated retrial of the murder and gang enhancement allegations. He also contends that Assembly Bill 333 requires reversal of the gang enhancement finding, even if it does not require reversal of the murder conviction.

The People concede, and we agree, that reversal of the gang enhancement finding is required under Assembly Bill 333. However, we otherwise find no reversible error and therefore affirm the second-degree murder conviction and firearm enhancement.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Shooting of Fernando Castellanos and Flores's Arrest*

On September 29, 2018, at approximately 5:30 p.m., Fernando Castellanos was shot and killed outside a house on Emerald Avenue in El Cajon. Castellanos was a documented member of the Paradise Hills gang, though it is unclear whether he was considered an active gang member at the time of his death. Castellanos sustained three gunshot wounds, and the recovered bullets indicated that they were likely fired from a .38-caliber gun.

In October 2018, the People filed a single-count information charging Flores with murder. (Pen. Code, § 187, subd. (a).)[1] The complaint alleged that Flores committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and personally discharged a firearm, proximately causing the victim's death (§ 12022.53, subd. (d)).

---

[1] Further undesignated statutory references are to the Penal Code.

B. *Evidence at Trial*

    1. *Eyewitness Testimony and Suspect Vehicle*

Several residents in the area were home at the time of Castellanos's shooting and testified at trial regarding the shooter and his vehicle. A.R., who was a young child at the time of the shooting, saw the shooter driving a "bright, sparkly blue" car in the middle of the street when he stopped, got out of the car, pointed a gun at Castellanos, shot him, and got back into his car and drove away. She said that a still photo of the suspect vehicle pulled from video footage looked "kind of the same" as the car she saw but that "it doesn't look that bright or shiny," which she said may have been "just because it's in the photo."

After hearing the gunshots and going outside, A.R.'s mother, L.R., saw a Mexican man, in his 20s or 30s and wearing a white tank top, drive away from the area in what she described as a "turquoise-blueish" or "blueish-green" four-door car. L.R. noticed that there was a logo on the trunk of the car that looked like an arrow pointing down and that the car's license plate had two zeroes.

Angelina I. also lived near the area where the shooting took place and was inside her apartment when she heard the gunshots. She saw a man with "light tan" skin, wearing a white tank top and beige shorts, get into a "blueish-green" car and drive away from the scene.

Detectives from the El Cajon Police Department collected surveillance videos from multiple cameras in the area of the block of Emerald Avenue where the shooting took place. The footage was compiled and presented to the jury. The footage did not capture the shooting, but it showed Castellanos walking on Emerald Avenue before the shooting, and it also captured a Pontiac G6 driving in the area before and after the shooting.

An investigative technician compared the Pontiac G6 in the video footage to Flores's car—which was a "green-ish, blue-ish" or "teal" Pontiac G6—and noted "class characteristics" and "unique characteristics" of both cars, including that both vehicles had a sticker in the lower right corner of the rear window, an object in the front window, and specific body damage in several areas of the car. Two investigating police officers opined that the car in the video was Flores's car based on the window stickers, the similar body damage to the car, and the fact that, like the car seen by the witnesses, Flores's license plate had two zeroes and a Pontiac emblem.

2. *Gang Evidence*

The prosecution also presented evidence of Flores's affiliation with the El Cajon Locos gang (ECL) and Castellanos's affiliation with the Paradise Hills gang. The court read to the jury a stipulation entered into by the parties that ECL and Paradise Hill each met the definition of a criminal street gang and had engaged in a pattern of criminal gang activity within the meaning of Penal Code section 186.22.

Sergeant Kenny Gray testified as a gang expert for the prosecution. He explained that the criteria the El Cajon Police Department uses in determining whether an individual is a gang member include associating with other known gang members, flashing gang signs, wearing gang-related clothing, hanging out in areas associated with a particular gang, committing offenses under section 186.22, and having gang-related tattoos. The expert answered a series of questions regarding these criteria in the context of ECL and discussed his experience dealing with ECL members.

Sergeant Gray also described gang culture and how important respect is within and among gangs, and he agreed that vandalism and tagging are common acts that signify disrespect among gangs. The prosecution showed

4

Sergeant Gray a photograph of graffiti done by ECL and Paradise Hills, and he explained that it depicted a "cross-out"—meaning that after ECL tagged the surface with "ECLS," someone had crossed it out in red paint and tagged "VPH" for Varrio Paradise Hills, another gang. According to Sergeant Gray, this was a show of disrespect towards ECL.

Sergeant Gray testified that, after reviewing the evidence, he believed that Flores was an ECL member at the time of the shooting and that Flores committed the crime for the benefit of the ECL gang. On cross-examination, he conceded that he had previously agreed with defense counsel that Castellanos's shooting could have been an isolated incident.

Another detective with the El Cajon Police Department explained that the department tracked graffiti incidents that had taken place in the months leading up to Castellanos's murder, and graffiti tracker reports showed that the Paradise Hills gang had tagged 13 locations in the area near the scene of the shooting. In one of the locations, Paradise Hills had put graffiti over ECL graffiti, and in another location, ECL had put graffiti over Paradise Hills' graffiti. The detective testified that ECL had also made a "bold statement" days before the shooting by tagging "ECLS 13" on the "full wall" of a building.

3. *Statements and Testimony from Witnesses Connected to Flores*

At the time of the shooting, Flores lived with his then-girlfriend, Estefania, and their three children. She testified that in 2018, she drove a Nissan Pathfinder and Flores drove a green car. According to Estefania, Flores was the only person who drove his car. Flores regularly worked Mondays through Fridays and sometimes performed extra side jobs on the weekends, including on the day Castellanos was killed. At trial, Estefania initially stated that she did not recall specific details about the events of the day of the shooting. On cross-examination, she testified that on the night of

5

the shooting, she did not see a gun (and had never seen Flores with a gun), she did not see anything suspicious, and Flores was not acting freaked out or panicked.

Estefania testified that she did not think Flores was a member of ECL, but she thought he might have friends who had been associated with ECL. When she and Flores were teenagers, she heard someone call him by the name "Whisper" and so she called him by that name. Flores told her not to call him "Whisper" because, according to Estefania, "that's not something he wanted the kids to know, or that's not a life he had."

Edeer T. is a self-identified ECL gang member, also known as "Cartoon," who testified at trial under a section 1324 grant of immunity. Edeer's association with ECL began when he was 13 years old, but he testified at trial that had not been an active member for over a decade. Edeer and Flores had known each other for about ten years. In 2018, the two men spoke on the phone once per week on average, and it was not unusual for them to communicate back and forth several times per day. Although Edeer was aware Flores was known by the nickname "Whisper," he testified that Flores had never been a member of ECL.

In November 2018, detectives interviewed Edeer while he was in custody after being arrested in an unrelated matter. During the interview, Edeer recounted a phone call he had with Flores soon after the shooting and suggested that Flores had admitted to shooting Castellanos. Video and audio clips from the interview were played for the jury, including the following:

"[Officer 1]: Was he kind of panicked about it?

[Edeer]: Yeah.

[Officer 1]: Did he ask you like what to do with the gun?

6

[Edeer]: Hm-mm.  I just told 'im like 'Hey man, fuckin' – I was like, 'I don't know what you're going to do, man, but you got to do what you got to do.'  You know, 'I think you overreacted on this[.]'

[Officer 1]: Do you think that -- can I run some scenarios by you and you tell me what you think from when you talked to Whisper.  Because I hear you -- I mean I don't know what his mindset was, you know?  Do you think that he felt like this could get him more respect because maybe people didn't take him seriously?

[Edeer]: No.  Not at all.

[Officer 2]: He wasn't trying to like make a name for himself or anything like that?

[Edeer]: No.  No, he was down -- he was -- he was a -- he was a solid little homie, but -- not to-- not trying to be there . . .

[Officer 1]: Not -- not like a shooter normally?

[Edeer]: No, not at all.

[Officer 1]: So then what did he say why it happened?

[Edeer]: He just said, you know like, the guy was trippin' and do what he gotta do.

[Officer 1]: Mm-hm.

[Edeer]: And I told him like, 'You overreacted, man.'

[Officer 2]: Well he definitely called you right after . . .

[Edeer]: Yeah, yeah.

[Officer 2]:  . . . he called you minutes after.

[Edeer]: That, yeah.

[Officer 2]: So when he called you, did he ask to come over or did you suggest that he come over?  What -- what was that conversation?

7

[Edeer]: Um, honestly I remember, uh, answering the phone, half asleep. I just told him to come over. And that's when he came over; he was . . .

[Officer 2]: What did he say, though, during that conversation?

[Edeer]: He just said something bad happened.

[Officer 2]: Okay.

[Officer 1]: On the phone call or . . .

[Edeer]: Mm-hm.

[Officer 1]: . . . in person?

[Edeer]: I said, 'Alright just come over.' [¶] . . . [¶]

[Officer 1]: Um, was he -- I mean when you're telling him, 'Hey, just go to work and don't kick and it with the homies and -- and make it look normal,' would -- like what did you guys think was gonna happen to him, though?

[Edeer]: Honestly, me, I knew he would get caught sooner or later.

[Officer 2]: Mm-hm.

[Edeer]: You know. You know, there's cameras on the freakin' intersections, there's --

[Officer 2]: Mm-hmm.

[Edeer]: -- like you said, you know, I watch those shows, you know, you -- you can get pinged all that.

[Officer 1]: And then do you remember after you found out that the guy died, the next time that night that you and Whisper talked or texted? Like how did that come up?

[Edeer]: As far as?

[Officer 1]: Like do you - were you like, 'Hey man, that guy died'?

8

[Edeer]: Yeah, yeah, I told him like, 'Hey, this fool died, dog.'  He was like-- stayed quiet.  And, like I said, I just told him, you know, 'Just keep doing what you got- keep doing the same thing you're doing.'

[Officer 2]: Mm-hmm.

[Edeer]: But like you gonna post up with the homies you're gonna get caught up again.  And I guess that's what pretty much he was trying to do, you know, he's working.  I know like he was like going to Sea World and stuff.

[Officer 1]: When you're saying he was trippin' you're saying Whisper was trippin' or the other dude was trippin' on him?

[Edeer]: Dude, I know the other dude was trippin' on him. As far as why, you know, Hector did it, but I can't answer that 'cause I'm like-- you know, I'm not- I'm just not gonna go down and shoot someone.

[Officer 1]: Right.  Right, unless you have history with him or something.

[Edeer]: Yeah, yeah, like, you know, If it's not someone that I barely know I'm not gonna--

[Officer 1]: Right.

[Edeer]: --go to that . . .

[Officer 1]: So that's what you're sayin' Hector said, 'Dude was trippin' on me,' but didn't explain why?

[Edeer]: Yeah, pretty much and I- when I asked him who it was and he didn't even know who it was.  So . . ."

Juan M., Flores's cousin, testified that he and Flores worked together most days for several months before the shooting and performed side jobs on the weekends.  Juan owned a black F150 truck and Flores drove a "little Pontiac" that was "green-ish, blue-ish" and had body damage.  Juan never drove Flores's car.

On the day of the shooting, Juan and Flores performed a side job for a relative in El Cajon. Flores drove to Juan's house and Juan then drove the two of them to the side job in his truck. Juan testified that the two men finished the side job at about 2:00 or 3:00 p.m. They stopped at a couple of stores and got beer and then went back to Juan's house, where they hung out for about an hour. Juan estimated that Flores left his house at around 3:00 or 4:00 p.m.

Juan stated that he heard on the news that someone was shot near his neighborhood. When Juan saw Flores on September 30, he mentioned the shooting, but Flores had not heard anything about it. Juan told police in an interview in October 2018 that Flores stopped driving the Pontiac after September 29.

Juan said Flores was always texting on his phone, primarily with his girlfriend. He never saw anyone else use Flores's phone. Juan testified that he never saw Flores with a firearm.

4. *Flores's Cell Phone Records and Social Media*

A criminal intelligence analyst analyzed cell phone service records for Flores's cell phone for an eight-hour period that covered the time of the shooting. The analyst testified that between 5:03 p.m. and 5:35 p.m., there were twelve cell site activations from Flores's phone that utilized three cell towers near the Emerald Avenue location and Juan's house, where he had been before the shooting. There was a seven-minute "gap" between approximately 5:37 and 5:44 p.m., meaning the phone was not activating any cell sites during that time. At approximately 5:44 p.m., Flores's phone resumed cell site activity, using two cell towers near the Emerald Avenue location. The phone was used to make a call to Edeer's number at 5:45 p.m.,

10

and over the next several hours, Flores's phone was used to send and receive multiple calls and text messages to and from Edeer's phone.

Flores's social media also showed that one week before Castellanos's murder, Flores claimed to have gone shooting with a .38-caliber gun.

## C. *Conviction and Sentencing*

The jury found Flores guilty of second-degree murder and found true the gang and firearm enhancement allegations. The trial court sentenced Flores to 15 years to life for the murder conviction, plus 25 years to life for the firearm enhancement, and ordered the terms to be served consecutively. Because of the true finding on the gang enhancement allegation, Flores is required to serve a minimum of 15 years before he may be eligible for parole. (§ 186.22, subd. (b)(5).)

Flores filed a timely notice of appeal.

DISCUSSION

I

Flores first contends that we must reverse his second-degree murder conviction because the prosecution's gang expert witness, Sergeant Gray, improperly testified as to Flores's guilt and intent. He argues that although his counsel did not object to the testimony, an objection was not required to preserve the issue for appeal; in the alternative, he asserts an ineffective assistance of counsel claim. The People respond that Flores forfeited this argument by failing to object to the testimony at trial, that he cannot establish a claim of ineffective assistance of counsel, and that, in any event, the testimony was properly admitted. We agree with the People's first two arguments and thus need not reach the third.

During the prosecution's case, Sergeant Gray testified that, after reviewing the evidence, "it was [his] opinion that [Flores] was acting as a

gang member and committed the crime for the benefit of the El Cajon Locos."
Because Flores did not object to this testimony, he forfeited this argument.
(*People v. Prince* (2007) 40 Cal.4th 1179, 1246.)[2]

Anticipating the forfeiture argument, Flores contends in the alternative that defense counsel's failure to object to the expert opinion testimony constitutes ineffective assistance of counsel in violation of the Sixth Amendment. He argues that his counsel's performance was deficient because there could not be any tactical reason for her failure to object.

We disagree. To establish ineffective assistance of counsel, a defendant must show that (1) the "representation fell below an objective standard of reasonableness under prevailing professional norms," and (2) counsel's deficient performance was prejudicial—i.e., there is a reasonable probability that, absent counsel's failings, the result would have been more favorable to the defendant. (*People v. Scott* (1997) 15 Cal.4th 1188, 1211 (*Scott*); see also *Strickland v. Washington* (1984) 466 U.S. 668, 693–694 (*Strickland*).) It is "particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record." (*Scott*, at p. 1212.) For this reason, the Supreme Court has repeatedly held that where the record "sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim on appeal *must be rejected*." (*People v. Mendoza Tello* (1997) 15 Cal.4th

---

2 Flores argues that "no objection should be required to preserve this issue for appeal," because the magnitude of the error in admitting the testimony prevents it from being cured with a jury admonition. We are not persuaded. The case he cites in support of his assertion, *People v. Wharton* (1991) 53 Cal.3d 522, 565, does not stand for this proposition, and he provides no further analysis or support for the argument.

264, 266 (*Mendoza Tello*), italics added and internal quotation marks omitted; see also *Scott*, at p. 1212 [same]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1052 [reviewing court will find ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission" (internal quotation marks omitted)]; *People v. Mayfield* (1993) 5 Cal.4th 142, 188 (*Mayfield*) ["tactical choices presented . . . on a silent record . . . are better evaluated by way of a petition for writ of habeas corpus, and on direct appeal we reject them"].)

Applying these principles here, we cannot conclude based on the record before us that defense counsel fell below an objective standard of reasonableness by failing to object to Sergeant Gray's testimony, even assuming that such an objection would or should have been sustained. The record sheds no light on why defense counsel failed to object to the testimony. Flores has not filed a petition for writ of habeas corpus, and there is no indication defense counsel was asked for an explanation and failed to provide one. (See *Mendoza Tello, supra*, 15 Cal.4th at p. 266; *Mayfield, supra*, 5 Cal.4th at p. 188.)

We also cannot say there could be no rational tactical explanation for defense counsel's failure to object. Counsel could have reasonably concluded that objecting to Sergeant Gray's testimony would draw undue attention to it. (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 61 (*Ramirez*), review granted August 17, 2022, S275341; see also *People v. Huggins* (2006) 38 Cal.4th 175, 206 [no ineffective assistance of counsel where counsel's failure to object could be explained as tactical decision not to draw the jurors' attention to the prosecutor's comments].) After Sergeant Gray testified that he believed Flores committed the crime for the benefit of ECL, the prosecutor did not follow up on his statement but rather asked a different question about text

messages between Flores and his family members. Defense counsel may have determined that an objection would merely highlight Sergeant Gray's statement or call the jurors' attention back to it. She may also have been concerned that objecting would only cause the prosecutor to reformulate the question and elicit further damaging testimony in the form of a hypothetical matching the facts of the case. And she could have decided it would be more effective to challenge Sergeant Gray's testimony about Flores's association with ECL on cross-examination, as she did.

Flores argues that, under *People v. Torres* (1995) 33 Cal.App.4th 37 (*Torres*), defense counsel's failure to object to the testimony regarding Flores's membership in the gang and commission of the crime on behalf of the gang can have no strategic purpose. In *Torres*, the court concluded that the prosecution's gang expert testimony as to the definitions of robbery and extortion, the nature of the crime committed, and his opinion as to defendant's guilt were all improper, and that there was no tactical advantage in allowing the testimony to go unchallenged. (*Id.* at pp. 48–49.)

We decline to rely on *Torres* to find deficient performance on this record. The comment by Sergeant Gray in this case, which was brief and essentially ignored by both the prosecutor and defense counsel, is distinguishable from the back and forth between the expert witness and prosecutor regarding the crimes committed in *Torres*. On this record, as we have explained, defense counsel may have had one or more rational tactical reasons for failing to object to Sergeant Gray's fleeting comment. Moreover, the court in *Torres* ultimately found no ineffective assistance of counsel and affirmed the conviction based on a lack of prejudice under the second prong of the *Strickland* standard. (*Torres, supra,* 33 Cal.App.4th at pp. 49–53.) For this reason, the *Torres* court's finding of deficient performance was not

14

strictly necessary to its decision. (See *Strickland, supra*, 466 U.S. at p. 697 ["a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

In short, deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Based on the record before us, this is not one of those rare cases. We therefore conclude that defense counsel's failure to object to Sergeant Gray's testimony did not render her assistance ineffective.

## II

Flores next contends that the gang enhancement finding and his conviction for second-degree murder must both be reversed because of recent legislation modifying the statutory scheme regarding the imposition of gang enhancements. Effective January 1, 2022, Assembly Bill 333 enacted both substantive and procedural changes. (Stats. 2021, ch. 699, § 1.) The parties agree that the new substantive changes to section 186.22 apply retroactively to Flores and require reversal of the gang enhancement. Flores also argues that the new procedural provision requiring bifurcation of gang enhancement allegations at the defendant's request (§ 1109) also applies retroactively and requires reversal of his conviction. The People disagree, contending that section 1109 is not retroactive and, in any event, the failure to bifurcate was not prejudicial. We accept the People's concession as to the first point and, as we will explain, agree with their argument as to the second.

A. *Assembly Bill 333*

In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et seq.) to reduce

15

" 'criminal activity by street gangs.' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1205 (*Tran*), internal quotation marks omitted.)  The STEP Act created a sentencing enhancement for any felony committed " 'for the benefit of, at the direction of, or in association with any criminal street gang.' " (*Id.* at pp. 1205–1206; § 186.22, subd. (b)(1).)

In 2021, after the trial in this case concluded, the Legislature passed Assembly Bill 333, also known as the STEP Forward Act of 2021.  (Stats. 2021, ch. 699, § 1.)  The Supreme Court recently explained the many substantive changes Assembly Bill 333 made to the law on gang enhancements:  "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.'  (§ 186.22, subd. (f), italics added.)  Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually or collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.)  Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  (§ 186.22, subd. (g).)" (*Tran, supra*, 13 Cal.5th at

16

p. 1206.)  It also narrowed the list of predicate offenses that can be used to establish a pattern of criminal gang activity, removing vandalism, looting, and certain fraud-related offenses from the list.  (§ 186.22, subd. (e)(1).)

The Supreme Court also held in *Tran* that the rule of *In re Estrada* (1965) 63 Cal.2d 740 applies to the elements of a section 186.22 gang enhancement, and those statutory amendments therefore apply retroactively to nonfinal judgments.  (*Tran, supra*, 13 Cal.5th at pp. 1206–1207.)

Procedurally, Assembly Bill 333 also created section 1109, which requires the trial court, upon request from the defendant, to try a gang enhancement charge "separately from all other counts that do not otherwise require gang evidence as an element of the crime."  (*Tran, supra*, 13 Cal.5th at p. 1206.)  "If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense."  (*Ibid*.)  Section 1109 also took effect on January 1, 2022.  (*Ibid*.; Stats. 2021, ch. 699, § 5.)

B.  *Reversal of the Gang Enhancement Finding Is Required*

Flores contends, and the People concede, that Assembly Bill 333's substantive amendments to section 186.22 require reversal of the gang enhancement here.  We agree.

Under the statutory requirements as they existed before the enactment of Assembly Bill 333, Flores stipulated to multiple gang-related issues, including that ECL was a criminal street gang based on seven predicate offenses alleged by the People.  Specifically, the parties stipulated to the following:  "The El Cajon Locos, Paradise Hills, and Varrios Unidos each constitute a 'gang' within the meaning of Penal Code section 186.22:  a. Each group is an ongoing organization of 3 or more people; b. Each group has a common name, sign or symbol. . . .  Each group has chief or principal

17

activities which are listed in Penal Code section 186.22(e)(1)-(25) and constitute the primary activities of the gang. . . . Members of each group, whether acting alone or together, have engaged in a pattern of criminal activity of more than two qualifying crimes listed in Penal Code section 186.22(e)(1)-(25) all of which were committed after September 26, 1988 and occurred within three years of each other." The trial court read this stipulation to the jury at trial.

Applying *Tran* to the facts of this case, we conclude that the jury's true finding of the gang enhancement allegation must be reversed. (*Tran, supra*, 13 Cal.5th at p. 1207 [reversal of gang enhancement required where "jury was not presented with any discernible theory as to how [gang's] members 'collectively engage[d] in' the[] predicate crimes," as required by current law].) As the People concede, the parties' stipulation below is inadequate to show that ECL engaged in a pattern of criminal activity that meets the new statutory requirements. The prosecution's gang expert testified (and the prosecutor argued in closing) that the murder benefited ECL's reputation, which is no longer a legally sufficient common benefit to the gang under section 186.22 as amended. Further, the jury instructions did not reflect the revised version of section 186.22, and the jury was not asked to make findings consistent with the new substantive requirements for the imposition of a gang enhancement.

We therefore reverse and remand the matter back to the trial court so that the prosecution has the opportunity to retry the gang enhancement allegation should it choose to do so. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 (*E.H.*) ["The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges."]); *People v. Salgado*

(2022) 82 Cal.App.5th 376, 380–381 [vacating gang enhancements and remanding for possible retrial at the election of the People].)

C. *Flores Has Not Established Prejudice Due to Lack of Bifurcation*

Flores contends that the same principles that require reversal of the gang enhancement also require reversal of his murder conviction, because the gang enhancement allegation was not bifurcated from the underlying charge. He argues that "a different outcome with the benefit of section 1109 is likely based on the lack of direct evidence supporting his conviction of the shooting of Castellanos," implicitly arguing that section 1109 applies retroactively to his judgment. The People disagree, contending that the statute applies prospectively only and that, in any event, the failure to bifurcate was harmless error.

As the parties point out, California courts are split on the question of whether section 1109 applies retroactively, and the issue is currently pending before the Supreme Court. (Compare, e.g., *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–567, review granted July 13, 2022, S274743 [section 1109 applies retroactively] with *Ramirez, supra*, 79 Cal.App.5th at p. 65, review granted August 17, 2022, S275341 [section 1109 does not apply retroactively].) We need not weigh in on this issue, because even assuming that section 1109 applies retroactively, we agree with the People that Flores has not established prejudice due to a failure to bifurcate the gang enhancement allegation.

Prejudice based on failure to bifurcate is assessed under the *People v. Watson* (1956) 46 Cal.2d 818 harmless error test. (*Tran, supra*, 13 Cal.5th at p. 1209.) Generally, reversal for such state-law errors is not warranted unless there is a reasonable probability that, absent the error, the appellant would have obtained a more favorable result. For several reasons, we

19

conclude that there is no reasonable probability Flores would have obtained a more favorable outcome had the gang enhancement allegation been bifurcated.

First, much of the gang-related evidence admitted at Flores's trial was admissible to prove the underlying offense and thus would have been presented to the jury regardless of bifurcation. The Supreme Court has explained that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like— can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*); see also *Tran, supra*, 13 Cal.5th at p. 1208 ["gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime"].) And, as the People point out, "nothing in Assembly Bill No. 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132 (*Ramos*).) Thus, "[t]o the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice [from a failure to bifurcate] would be dispelled." (*Hernandez*, at pp. 1049–1050.)

Here, the prosecution's theory of the case was that Flores's sole reason for committing the crime was his association with ECL. Because of this, evidence of Flores's ties to ECL, the nature of the gang, the means of advancement within the gang, the status its members obtain by committing crimes, and ECL's rivalry with the Paradise Hills gang—of which Castellanos

20

was a member—would have been relevant and admissible to prove Flores's motive and intent at the trial focused on the underlying offense. (See *People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted December 14, 2022, S277103 [failure to bifurcate was harmless where "evidence of defendant's affiliation with [the gang] and the nature of [the gang] would have been admissible for reasons aside from any effort to prove the special circumstance and gang enhancement findings, for instance, defendant's motivation for the killing"]; *Ramos, supra*, 77 Cal.App.5th at p. 1131 [asserted failure to bifurcate was harmless where "some, though not all, of the evidence of [the defendant's] gang membership and the gang rivalry would have come in at a trial on just the substantive offenses"].) Flores does not point to any evidence he claims was admitted solely to prove the gang enhancement allegation.

Second, the People presented compelling evidence of Flores's guilt. Eyewitness testimony and video surveillance footage placed a Pontiac G6 appearing identical to Flores's car (including a unique sticker and body damage) at the scene of the murder at the time it occurred, the eyewitness testimony supported a finding that this was the shooter's car, there was evidence that no one other than Flores drove his car, analysis of his cell phone records also placed him in the area of the crime at the time of the shooting , and Edeer T. told police officers that Flores essentially admitted to shooting Castellanos in a phone call he made shortly after the murder (which was corroborated by Flores's cell phone records). Given this additional evidence, it is not reasonably probable that the admission of any evidence admitted solely to prove the gang enhancement allegation prejudiced Flores in his trial on the underlying murder charge. (See *Tran, supra*, 13 Cal.5th at

21

pp. 1209–1210 [failure to bifurcate was harmless where "[t]he case for guilt . . . was strong"]; *E.H., supra*, 75 Cal.App.5th at p. 480 [same].)

Finally, the trial court instructed the jury with CALCRIM No. 1403, explaining: "You may consider evidence of gang activity, only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and enhancements charge[d], or the defendant had a motive to . . . commit the crime as charged. . . . [¶] You may not consider this evidence for any other purpose, and you may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit a crime." We presume that the jury followed such limiting instructions where, as here, there is nothing in the record to rebut that presumption. (*People v. Franklin* (2016) 248 Cal.App.4th 938, 953; see also *Ramos, supra*, 77 Cal.App.5th at p. 1132 ["the jury was given a limiting instruction regarding its consideration of the gang evidence, which we presume it followed"].) Indeed, the prosecutor herself emphasized this point in her closing argument, telling the jury: "I don't want you to use this evidence improperly. This country has a very firm constitution that recognizes freedom of association, and it is not a crime to be a gang member. It is only a crime when you commit other crimes in furtherance of that gang."

For all of these reasons, we conclude that any error in failing to bifurcate the gang enhancement proceeding from the trial on the underlying offense was harmless, as it is not reasonably probable Flores would have obtained a more favorable result had the gang enhancement allegation been bifurcated. Reversal of his murder conviction is therefore unwarranted.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The jury's true finding on the gang enhancement allegation (Pen. Code, § 186.22, subd. (b)) is vacated and the matter is remanded to the trial court with directions to: (1) give the People 60 days from the date of the remittitur to file an election to retry Flores on the vacated gang enhancement; (2) either conduct a new trial on the gang enhancement if the People so elect or strike the gang enhancement if the People do not elect to retry it; and (3) resentence Flores. In all other respects, the judgment is affirmed. Following the conclusion of proceedings on remand, the trial court shall amend the abstract of judgment as necessary and forward copies of the amended abstract to the Department of Corrections and Rehabilitation.

BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.

23